## E. M. SMITH v. STATE.

No. A-6448. Opinion Filed March 9, 1929.
(275 Pac. 359.)

Wilkinson & Wilkinson, for plaintiff in error.

Edwin Dabney, Atty. Gen., and J. H. Lawson, Asst. Atty. Gen., for the State.

CHAPPELL, J.   The plaintiff in error, hereinafter called defendant, was convicted in the district court of Stephens county, Oklahoma, upon a charge of embezzling certain personal property, to wit, one hog, of the value of $22.84.   The jury returned a verdict of guilty as charged, and assessed the punishment at imprisonment for one year in the penitentiary.   The defendant, in his motion for a new trial, sets out nine separate errors alleged to have been committed by the trial court.

Counsel for defendant in his brief argues only the first and fifth specifications of error; the first being: "The verdict of the jury is contrary to law and not supported by the evidence."   Second.   "That there was a fatal variance between the allegations of the information and the proof offered by the state."

This court held in the case of Jackson v. State, 42 Okla. Cr. 86, 274 P. 696.

"The jury are the exclusive judges of the credibility of the witnesses, and this court will not reverse a conviction where there is any evidence in the record from which the jury could legitimately draw the conclusion that the defendant is guilty."   Summers v. State, 7 Okla. Cr. 10, 120 P. 1031.

"A motion for new trial, based on an allegation that the evidence does not support the verdict of the jury is addressed, first, to the south discretion of the trial court, who has seen and heard the witnesses testify, and who must necessarily know a great deal more about many facts and circumstances produced at the trial, which cannot be written into a record, than an appellate court can by reading the record after it is written. And when a trial court has considered and passed upon such an issue, it comes to this court only on the proposition that as a matter of law the verdict is contrary to the evidence." Harrison v. State, 10 Okla. Cr. 210, 135 P. 948.

The evidence in this case is ample to prove the commission of a crime by the defendant.

Under defendant's second ground of error, "a fatal variance between the allegations of the information and the proof offered by the state," the defendant's counsel argues that, if the defendant was guilty of any crime, it was larceny, and not embezzlement.

The statute under which the prosecution was conducted is section 2126, C. O. S. 1921, as follows:

"If any clerk or servant of any private person or copartnership or corporation, except apprentices and persons within the age of eighteen years, fraudulently appropriates to his own use, or secretes with a fraudulent intent to appropriate to his own use, any property of any other person which has come into his control or care by virtue of his employment as such clerk or servant, he is guilty of embezzlement."

In the case of Harrie Blake v. State, 12 Okla. Cr. 549, 160 P. 30, L. R. A. 1917B, 1261, syllabus 1, this court, in defining embezzlement, says:

"(a) A fraudulent conversion is an essential element of the crime of embezzlement and such conversion must be shown by proof that the embezzler appropriated the money to his own personal use or that he placed it to some other use than the purpose for which it was re-

ceived by him, or that he failed to account for and pay over the same on proper and lawful demand. (b) Proof of a mere failure to pay over money, standing alone, will not support a judgment of conviction for embezzlement."

The evidence of the state is substantially as follows:

O. C. Hartley, witness:

"Q. State your name, please. A. O. C. Hartley. Q. Where do you live? A. Fourteen miles southeast of here. Q. You know the defendant, E. M. Smith? A. I do. Q. Tell the jury whether or not he was working for you on your place there this year; in February, this year. A. Yes, sir. Q. Did you have any hogs up there on your place for fattening purposes for market? A. Yes, sir. Q. How many? A. Six. Q. Were those hogs being fattened for market? A. Yes, sir. Q. How many hogs were there? A. Six. Q. Did the defendant, E. M. Smith, have charge of those hogs for fattening? A. Yes, sir. Q. Do you recall the time when those hogs were brought here and sold? A. Yes, sir. Q. Were you at home on that occasion? A. No. Q. Now, prior to that occasion had you arranged with Mr. Smith, to bring those hogs to town and sell them? A. Yes, sir; that I would bring them; yes, sir. Q. Now then, were they brought here on the day you had arranged to bring them? A. No. Q. Now, then, how many hogs were reported to you by Mr. Smith that he sold here in Duncan? A. Five. Q. Know who he sold them to? A. Mr. Speegle. Q. Did he report the proceeds of those hogs? A. Five of them he did. Q. Did he say anything about the other hog? A. Said he turned her out. Q. Was that hog found on your place since your return? A. Never been seen since. Q. Did you come to Duncan after you discovered the hog was gone? A. Yes, sir; I came to Duncan, after I discovered the hog was gone. Q. Did you make an investigation where the defendant sold the five hogs? A. Yes, sir. Q. What did you learn down there with reference to the other hog? * * * Q. Did you ascertain whether or not the defendant, Smith, had sold him another hog, other than the five hogs he reported to you? A. Yes, sir. Q. That occurred here in Stephens county, Okla-

homa? A. Yes, sir. Q. How long had Mr. Smith been working for you at that time? A. Up since July last year. Q. You know about the value of these hogs; what they sold for? A. About 24."

L. E. Toney, witness:

"Q. State your name. A. L. E. Toney. Q. What is your business? A. Deputy sheriff. Q. You recall the occasion when Mr. Hartley made complaint with reference to the loss of a hog? A. I do. Q. Did you go down and bring Mr. Smith to Duncan? A. I did. Q. I'll ask you if you recall a conversation between the defendant, Mr. Smith, and myself with reference to this particular hog? A. I do. Q. I'll ask you if in that conversation the defendant, Smith, here admitted bringing the hog to Duncan and selling it to Speegle? * * * Q. Go ahead and tell what was said in that conversation. A. You were questioning this man about this hog, as to how it compared with this other hog, and he said it was about the same kind of hog he had turned out of the pen down there, and said he bought it from a fellow, he said, six miles out from Duncan, driving a truck, and had it in a trailer. Q. Remember what he said about knowing the man he bought it from? A. Said he didn't know what the man's name was, or where he was at, or anything about it; said he paid $20 for it, $20 in cash."

Julia Hall, witness:

"Q. State your name. A. Mrs. Emmett Hall. Q. Mrs. Hall, you recall the occasion when Mr. Smith sold some hogs to Mr. Speegle, here in Duncan? A. Only thing I know I gave a check to Mr. Smith. Q. You wrote the check out? A. Yes, sir. Q. Can you tell how many checks you wrote out? A. Two. Q. Know how many hogs they were given in payment of? A. I wrote one for five hogs and one for one hog. Q. Both to the defendant? A. Yes, sir. Q. How much was the check for one hog? A. $22.84. Q. Know what date they were on? A. Eighth day of February. Q. Have you the record? A. Just weight 185 pounds."

The undisputed evidence in this case is that the defendant took six hogs to town and sold them. He had

two checks made out, one for five hogs and one for one hog, the value of the five hogs going to O. C. Hartley, the owner, and the value of the one hog going to the defendant. The testimony of Mr. Hartley, the owner, is that he left the hogs in the possession of the defendant for fattening or to be sold. The defendant testifies that he only started to town with five hogs, and on the way met a man he had never seen before, and whose name he did not remember; that this man had a hog in the trailer attached to his car, and being on the way to Texas, and needing the money, he offered to sell the hog to the defendant. The defendant testified that he bought this hog from the stranger for $20. The story is so unreasonable that the jury no doubt rejected it. The question now is: Under the facts in this case, as disclosed by the evidence, did the taking of the hog by the defendant constitute larceny or embezzlement?

In the case of Neal v. State, 55 Fla. 140, 46 So. 845, 19 L. R. A. (N. S.) 371, that court, in construing the statute similar to ours, held:

"Evidence that a laundress upon discovering in a clothes basket committed to her, a bag of money belonging to her employer, accidentally placed therein, recognized her duty to return the bag to its owner, but subsequently, and before so returning it, fraudulently converted the money, will support a conviction of embezzlement," under a general statute providing that, if any servant embezzles or fraudulently "converts to his own use anything of value which has been intrusted to him, or which has come into his possession, care, custody, or control by reason of his * * * employment, * * * he shall be punished as if he had been convicted of larceny."

The holding of the Florida court under our statute did make the crime embezzlement. It evidently was the intention of the makers of our statutes to make one guilty of embezzlement if property was left in his care, even though the possession of the property did not pass from the owner.

This court cannot split hairs on points of law. Under the old English procedure, a misdescription of the crime was fatal; but under our Code technicalities and legal subterfuges are done away with, and wide latitude given to the courts in determining what constitutes a particular crime. The property alleged to have been embezzled came under the control of the defendant by virtue of his employment by O. C. Hartley, and the language of the statute itself makes it embezzlement, where a party comes into possession or control of property by virtue of his employment and appropriates the property to his own use.

The information properly charged the crime of embezzlement, the evidence is sufficient to support the verdict, and, no reversible errors of law appearing in the record, the cause is affirmed.

EDWARDS, P. J., and DAVENPORT, J., concur.