Eddie OXENDINE, alias Don Locklear, Plaintiff in Error,

v.

STATE of Oklahoma, Defendant in Error.

No. A–12800.

Court of Criminal Appeals of Oklahoma.

March 16, 1960.

Lewis F. Oerke, Lawton, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., Warren H. Crane, County Atty., Comanche County, Lawton, for defendant in error.

POWELL, Presiding Judge.

Eddie Oxendine, alias Don Locklear, plaintiff in error, hereinafter referred to as defendant, and James Spence, were charged jointly in the district court of Comanche County with the murder of Ruth Zimmerman, by shooting.

The parties were first tried together, convicted and punishment assessed at death. The State produced ample evidence, in addition to the written and verbal confessions of the defendants showing that they killed the deceased in the process of a robbery, and that the deceased was tied and gagged at the time she was killed by defendants in

an apparent attempt to prevent detection and identification, to sustain the conviction. Truly the evidence disclosed a cruel and wanton murder and was amply sufficient to support the extreme penalty assessed.

Nevertheless, this Court felt compelled to send the case back for a new trial. This because there was received in evidence certain pictures of the deceased that were prejudicial in the form presented. The pictures were not limited to the area of the body showing points of entry of bullets and point of egress of one bullet, but showed the entire nude body of a young woman multilated by an extensive autopsy. Such pictures in the form received were shocking, and this Court concluded such might, in spite of the uncontroverted evidence of guilt, have accounted for the assessment of the extreme penalty. See Oxendine v. State, Okl.Cr., 335 P.2d 940.

 While the members of this Court, regardless of any personal views as to the policy of a State making legal the exacting of a person's life as punishment for crime, may not, as a court, question the fact of the plain and unambiguous statute, 21 O.S. 1951 §§ 701, 707,[1] it is binding on this Court. But it is the solemn duty of each member to satisfy his conscience that persons who receive the penalty of death at the hands of a judge or jury, however guilty such persons may appear to be, have been afforded due process of law and that they received a fair and impartial trial.

The court-appointed attorneys strove valiantly. A second trial ended in a hung jury and a mistrial. Then each defendant moved for a severance, which was granted.

---

1. See Vol. IV, No. 9, Feb. 1, 1960 issue of Christianity Today, published fortnightly, 1014 Washington Bldg., Washington, D. C., "Capital Punishment and the Bible." The editor notes: "During the past 28 years 3616 persons have been executed in the United States—3136 for murder, 418 for rape, and 62 for other offenses, such as treason, espionage, kidnapping, and bank robbery. Nine states (Alaska, Delaware, Hawaii, Maine, Michigan, Minnesota, North Dakota, Rhode Island, and Wisconsin) have set aside capital punishment, but all the others, along with the District of Columbia, impose the death penalty (including eight states which in times past abolished capital punishment only to re-instate it)." See also American Bar Association Journal, issue of March, 1959, for related discussion, p. 250, "An unsolved problem: Comparative sentencing techniques" by B. J. Gey, Jr., Prof. of Law, University of Michigan Law School;. and "Capital Punishment in Britain" at p. 259.

Defendant Oxendine was tried separately in the district court of Comanche County, was found guilty of murder by the jury, and his punishment fixed at death. Spence obtained a change of venue to Cotton County, where he was likewise convicted and his punishment was fixed at death. An appeal for Spence is currently before this Court.

At the trial of Oxendine, commencing on May 13, 1959 and ending May 15, 1959, the State used fifteen witnesses. The sufficiency of the evidence is not questioned. The plea of counsel is for mercy, and objection to four instructions given by the court to the jury. The Attorney General dismisses these claims of error with one paragraph, but we shall briefly summarize the evidence sufficient for an understanding of the propositions advanced and then treat each proposition in order presented.

The undisputed evidence discloses that Reggie N. Zimmerman and Ruth Zimmerman, his wife with their four months baby, were living in an apartment above a war-surplus store near Lawton. Reggie was assistant manager of the surplus store.

About 9 p. m. on the night of the alleged murder, Mr. Zimmerman, after closing the store, climbed the outside stairs which led to his apartment where his family was waiting. The defendant Oxendine, accompanied by one Spence, each armed with an automatic pistol, was passing by and saw Mr. Zimmerman going up the stairs with a sack in his hand. They consulted and decided that he was carrying money, recounted that they were getting low on funds, and agreed to rob Mr. Zimmerman.

The defendant Oxendine, after climbing the stairs, tricked Zimmerman into opening the door of his apartment by telling him that he had a flat tire and wanted to borrow a jack; then, at pistol point forced his way into the apartment. Spence then entered and forced Zimmerman to go downstairs with Oxendine and open the surplus store safe, Spence remaining with Mrs. Zimmerman. Oxendine had a pistol at Zimmerman's back during this time. After Oxen-

dine and Zimmerman returned to the upstairs apartment, Zimmerman testified that the following took place:

"Oxendine goes over toward the kitchen wall and he comes back and he tells me to lay face down on the floor, so I laid down on the floor. He tied me up, put a gag in my mouth and Spence tells him to take me to the closet; and my wife spoke up about that time and said, 'Why can't you go on and leave us alone? I've got a baby to tend to here through the night.' Spence spoke up and said, 'they can't identify us this way, and go ahead and put them in the closet.' Oxendine put me in the closet, closed the door and went back to the kitchen, brung my wife back to the closet. She was tied and gagged also. He shut the door. I heard footsteps, thought they were leaving. About that time they stopped and I heard them talking. I couldn't understand what they was saying. About that time the closet door came open and the white guy [Spence] was standing there shooting. I didn't know at that time how many shots was fired. As soon as they quit firing I jumped up and run to where the baby was. There wasn't nobody there. I turned around. My wife had fell to her knees. I run to her and she just groaned and fell over on the floor."

The evidence further shows that Spence emptied his pistol at the prostrate forms, hitting the husband three times, and the wife twice. One bullet penetrated the 19-year old wife's heart and she died quickly. Zimmerman said that Oxendine was the one who opened the door to the closet, while Spence fired.

Although gagged and with his hands tied, Zimmerman made his way to a neighbor, a policeman, who got word to the other officers, and an ambulance was ordered.

Mr. Zimmerman had described his assailants to the officers and had told them that he had observed a black Pontiac car, apparently a 1950 or 1951 model. The officers

started looking for persons fitting the descriptions given, and many officers began searching Lawton for black Pontiac cars, and checking them, and tracing ownership.

Ernest Lovett of the State Bureau of Investigation saw a Pontiac car fitting the description given by Mr. Zimmerman with a North Carolina tag MTO 586 parked in an alley between "E" and "F" and between Fifth and Sixth Streets on the south side of the alley. Early the next morning they received information from North Carolina that the car was registered in the name of James Spence, of Deep River, North Carolina. The officers then checked the apartment houses near where they had seen the car, and found that one James Spence and Eddie Oxendine had rented an apartment at 523½ F Street on March 25, and had paid $80 in advance for a month's rent.

The officers searched this apartment on the morning of April 1, 1958, following the murder on March 31, 1958, and found it abandoned. They found in the attic a pillow case that contained the keys to the surplus store. Oxendine and party were apprehended at A M Motor Court at Albuquerque, New Mexico on the morning of April 4, 1958. Defendant gave the New Mexico officers a complete written confession and later repeated his confession to Oklahoma officers.

M. T. McCracken, deputy sheriff and jailer of Comanche County, testified that after Oxendine and Spence were incarcerated in the county jail at Lawton on a Saturday afternoon, that he investigated some strange noises and found that defendant Oxendine had removed part of the plumbing from his cell and pried the bottom of his cell door out of the tracks for 12 to 14 inches, and was about to get it open sufficiently to escape.

The jailer took food to the prisoners and talked with them. Said he (referring to the time just after incarceration):

"When I went back to feed them, that was the first occasion for me to see either one of them; and I just made the remark, 'Well, it looks like you boys kind of got yourself into a wringer.'

"Q. And did Eddie Oxendine make any statement to that remark? A. He did.

"Q. What did he say? A. He said, 'Where we made our bad mistake was not staying and seeing that they were both dead.' He said, 'If we had, we would have still been loose.'

"Q. Did you have any conversation with Eddie Oxendine at the time of the jail break? A. I did.

"Q. What was the nature of that conversation? A. He said he was going to still be trying to get loose when they set him in the electric chair and James Spence told him, he says, 'You might as well set down and shut up. They've got you and they're going to keep you.'"

For reversal of the case counsel argues that the court erred in giving Instructions Nos. 3, 6, 8 and 9. Instruction No. 3 reads:

"The statutes of the State of Oklahoma provide: Homicide is murder in the following cases: (1) When perpetrated without authority of law, and with a premeditated design to effect the death of the person killed, or of any other human being; (2) When perpetrated by any act imminently dangerous to others and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual; (3) When perpetrated without any design to effect death by a person engaged in the commission of any felony."

The above instruction, it may be observed, is in the words of the statute, 21 O.S.1951 § 701. But counsel argues that the instruction was prejudicial to Oxendine because the felony, robbery, had already been committed when Oxendine opened the closet door and Spence did the shooting. He says that in the confessions by Oxendine and

Spence, each said that Spence directed Oxendine to open the closet door, and that Spence did the actual shooting.

We find nothing wrong with this instruction. The evidence showed that Oxendine purchased both the pistols that he and Spence were armed with, and that they mutually agreed to the robbery, and there was evidence that Oxendine and Spence were in mutual agreement to murder the Zimmermans to prevent detection and identification. Oxendine so expressed himself to Jailer McCracken.

 It is next urged that Instruction No. 6 is not a correct statement of the law; that the felony complained of had already been committed and that the defendant Oxendine had nothing to do with the killing. This instruction reads:

"You are instructed that where two or more persons enter into a plan or conspiracy to commit a felony which may result in the death of another, and such death ensues as a result of the act of either or both of them committed during perpetration of such felony, all such parties, so acting together are alike guilty of homicide notwithstanding that only one of them actually fired the shot that caused the death of the deceased; and in such event it is immaterial whether there was a premeditated design to effect such death. Further, in connection with this instruction, the offense of robbery is a felony under the laws of the State of Oklahoma."

By 21 O.S.1951 § 172, it is provided:

"All persons concerned in the commission of crime, whether it be a felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, are principals."

In the early case of Holmes v. State, 6 Okl.Cr. 541, 119 P. 430, 435, 120 P. 300, one Holmes and others saw a white man in an Oklahoma City street at night and decided to rob him. The defendant Holmes, and Bud Johnson, Cy Booker and Charlie Posey grabbed the victim, threw him down and got his money. One Blue stood off and held a gun on the victim, and after Posey got the money, Blue fired and killed the victim. They went to a hotel and divided the money. In the body of the opinion Judge Furman, speaking for the Court, said:

"When a conspiracy is entered into to do an unlawful act, all persons who engage therein are responsible for all that is done in pursuance thereof by any of their co-conspirators until the object for which the conspiracy was entered into is fully accomplished. This responsibility is not confined to the accomplishment of the common design for which the conspiracy was entered into, but it extends to and includes collateral acts incident to and growing out of the common design."

In the Holmes case as in this case, the money had not been divided at the time of the killing. Further, in the within case there was evidence of a conversation between Oxendine and Spence after binding, gagging and placing the victims in the closet, and in pursuance of such conversation Oxendine aided Spence by opening the door to the closet, whereupon Spence emptied his gun into the victims, killing Mrs. Zimmerman immediately. Defendant told the jailer McCracken that their only mistake was not staying to see that the Zimmermans were dead.

And see also Wilson v. State, 32 Okl.Cr. 139, 240 P. 155, a case in point and supporting the general principle that where a conspiracy is entered into to commit an unlawful act, conspirators are responsible for all that is said or done by their co-conspirators pursuant to the conspiracy, until the purpose has been fully accomplished. See Parnell v. State, 96 Okl.Cr. 154, 250 P.2d 474; Shetsky v. State, Okl.Cr., 290 P.2d 158; Ex parte Finney, 21 Okl.Cr. 103, 205 P. 197; Gandy v. State, 34 Okl.Cr. 350, 246 P. 887; 11 Am.Jur., Conspiracy, §§ 8 and 9.

■ Instruction No. 8 was objected to by defendant because defendant's written confession had admitted the robbery and flight, and though Oxendine did not testify at his trial, his confession was in evidence. The State was entitled to put on cumulative evidence as to flight, and the instruction complained of was a standard instruction on the subject.

In Smith v. State, Okl.Cr., 291 P.2d 378, this Court held that the State, as a part of its case, might prove flight of the defendant as a circumstance tending to prove guilt.

And in Wilson v. State, 96 Okl.Cr. 137, 250 P.2d 72, this Court held that in murder prosecution, evidence presented fact issue for jury as to whether defendant fled from scene of crime under consciousness of guilt in order to evade arrest and detention.

In the within case flight had a bearing on the reason for the wanton killing, and Oxendine's purpose in opening the closet door where the victims had been placed after being bound and gagged.

■ Instruction No. 9 was objected to as confusing. It reads:

"Keeping the foregoing instructions in mind, should you find from the evidence beyond a reasonable doubt that the defendant did on Monday, the 31st day of March, 1958, wilfully, unlawfully and feloniously, without authority of law and with a premeditated design to effect the death of one Ruth Zimmerman, make an assault in and upon the said Ruth Zimmerman with certain weapons and automatic pistols, loaded with powder and bullets, to-wit: two .25 calibre Galesi Automatic pistols, bearing serial numbers 199137 and 198500, respectively and then and there had and held in the hands of them, the said Eddie Oxendine, alias Don Locklear, and James Spence, and the said defendants did then and there, with said firearms and weapons so had and held as aforesaid, unlawfully, wilfully, wrongfully, and feloniously and with-

out authority of law and with a premeditated design to effect the death of the said Ruth Zimmerman, then and there fire, shoot and discharge the said firearms, weapons, and pistols, at, into and upon the said Ruth Zimmerman, then and there and thereby inflicting certain mortal wounds in and upon the body of the said Ruth Zimmerman, of which said mortal wounds so inflicted as aforesaid, the said Ruth Zimmerman did, on the 31st day of March, 1958, die as was intended by the said Eddie Oxendine, alias Don Locklear, and James Spence, conjointly and while acting together, she should do, with the unlawful, wrongful and felonious intent then and there on the part of them, the said Eddie Oxendine, alias Don Locklear, and James Spence, to kill and murder the said Ruth Zimmerman; or that said defendants or either of them, did, at the time and place stated in the information, perpetrate the homicide and cause the death of Ruth Zimmerman while said defendants were conjointly engaged in the commission of any felony, though without any design to effect the death of the deceased, then in either of such events, you shall find the defendant guilty as charged; but if you do not so find or should you entertain a reasonable doubt thereof, then in either of said latter events, you shall find the defendant not guilty."

We find the instruction to be a proper one, based on the record presented.

■ Counsel seeks clemency. He has ably represented the defendant, both in the trial court and in this Court. We have examined the record carefully. This was a very carefully and well tried case on the part of the County Attorney. We find nothing in the record to justify interference with the verdict of the jury. Counsel points out that after the robbery and after he had bound Mrs. Zimmerman and was fixing to gag her and Mr. Zimmerman with strings from a baby diaper, the mother was worrying about being unable to attend to the baby and feed it, and the defendant offered to

fix a bottle for the baby. But this show of human kindness was obliterated moments later by his opening the door for Spence to snuff out the lives of the Zimmermans, with the baby left to live or die. But for the three bullets penetrating Mr. Zimmerman's body failing to hit a vital spot, he survived. Otherwise the baby too might have succumbed for inattention.

The judgment and sentence of the district court of Comanche County is affirmed.

The time originally appointed for the execution of the defendant Eddie Oxendine, alias Don Locklear, having expired due to the pending of this appeal, it is ordered, adjudged and decreed that the judgment and sentence of the district court of Comanche County be carried out by the electrocution of the defendant Eddie Oxendine, alias Don Locklear, by the Warden of the State Penitentiary at McAlester, Oklahoma, on Tuesday, May 24, 1960.

BRETT, J., concurs.

Memorandum of NIX, Judge.

I have carefully examined the record in this case and find no error of law upon which to base this Court's interference with the verdict of the jury.